## EVANS et al. v. TEXTILE DYEING & PRINTING CO. OF AMERICA.

### No. 6165.

Circuit Court of Appeals, Third Circuit.

April 20, 1938.

Thomas G. Haight, of Jersey City, N. J., and E. W. Marshall and Wm. S. Pritchard, both of New York City, for appellants.

Louis Burgess, of New York City (John F. Neary, of New York City, of counsel), for appellee.

Before BUFFINGTON, THOMPSON, and BIGGS, Circuit Judges.

THOMPSON, Circuit Judge.

This is an appeal from a decree of the District Court for the District of New Jersey, dismissing a bill of complaint. The suit was for an injunction and accounting based on an alleged infringement of United States patent No. 1,579,628 issued to Olav Berg and Max Imhoff on April 6, 1926. During the course of the proceedings, both patentees died. The executors of Olav Berg were substituted as parties plaintiff and together with the licensee, the United Piece Dye Works, are appellants herein.

The patent in suit is for a process for weighting silk by the use of lead and for the product so obtained. The District Court held the patent invalid because completely anticipated by the disclosure of the Sisley patent, issued in France in 1896.

The weighting of silk is an old art well known to the silk dyeing industry. It is a process whereby metallic compounds are associated with silk fibers so as to increase the swell or volume of the silk and its weight. For many years the so-called tin-weighting process has been in almost universal use. In order to weight silk by the tin-weighting process the silk is immersed in successive baths of tin tetrachloride, water (for the dual purpose of forming a tin hydroxide jelly and of disposing of any hydrochloric acid which may have been liberated), sodium phosphate (to neutralize any acid which might remain), sodium silicate, and water. In 1896, Puller, to whom was issued French patent No. 254,659, disclosed that it was possible to use in conjunction with the above-described tin-weighting process, the salt of a metal other than tin; namely, aluminum sulphate. To practice the Puller teachings, the silk, having received a preliminary tin-weighting treatment, is then subjected to successive baths of aluminum sulphate, water, sodium silicate, and water. In the same year, Sisley, having studied the tin-weighting process and the teachings of the Puller patent, concluded that any salts of metals which form insoluble phosphates might be substituted for the aluminum salt bath of the Puller patent. In his patent disclosures, Sisley, like Puller, required that the silk be first weighted by the tin process. As a substitute for aluminum he named twelve metals, among which was lead, as providing soluble salts which could be used conjointly with the tin salts for weighting. The entire working procedure, including the preliminary tin weighting, is briefly summarized:

"(1) Passage through a bath of bichloride or tin solution, washing.

"(2) Passage in the cold or the hot state through a bath of alkaline phosphate, silicate, or tungstate, washing.

"(3) Passage in the cold or the hot state through baths of metallic salts of the aforesaid metals, capable of yielding an insoluble phosphate, silicate, or tungstate."

The Berg and Imhoff patent in suit, which was issued in 1926, also requires as a preliminary that the silk be treated by the tin-weighting process, and then adds the steps claimed to be novel to the art. The silk, already weighted with tin, is immersed in a solution of lead acetate, washed in fresh water so thoroughly that no lead reaction can be found in the wash water, subjected to a warm bath containing sodium phosphate, and once more given a water wash. A further treatment with sodium silicate is optional. It is obvious that the novelty, if there is any novelty, must be found in that portion of the process involving the treatment with lead acetate, water, sodium phosphate, and water, for the patentees themselves make no claim to the preliminary steps of weighting with tin. We do not find any novelty when this process is compared with the prior patent. Sisley directed one who wished to use lead in the weighting process to select any one of the lead salts which is soluble in water and such as will form an insoluble phosphate, silicate, or tungstate. The choice is one which any qualified chemist would be able to make. Lead acetate is one of the salts soluble in water, and sodium phosphate, sodium tungstate, or sodium silicate are the possible alkaline salts. The patentees merely made a selection when they directed the use of lead acetate as the metal salt and sodium phosphate as the alkaline. We see no invention in making this choice. The argument that the Sisley patent does not anticipate the patent in suit because it does not specify a water wash treatment after the bath in the metal salt does not convince us. The Sisley patent does teach that the customary step after treatment of the silk with a metal is to subject it to a water wash.

We conclude that the findings of fact and conclusions of law of the District Judge are amply sustained by the evidence. The decree of the District Court is affirmed.

BUFFINGTON, Circuit Judge (dissenting).

This case concerns generally in the silk art the weighting of silk threads by metals and, referring to the patent in suit, such weighting by the use of lead, which is firmly held on the silk fibres in fixed and insoluble form—and we here note that the gist of this patent, and wherein its novelty, use, and efficiency lie, is the lead being fixed, and above all insoluble. We cannot emphasize too strongly this feature of insolubleness. If the lead fixation is soluble, then all the dangers of lead poisoning are free to operate. Such being the case, our first inquiry is whether, in the metallic weighting of silk, poison dangers were real and prohibitive where lead was used. Of that there can be no question. Weighting of silk by the use of tin was well known, but the tin supply of the world was limited and expensive. The possibility of the use of lead, which was much cheaper, was known, but the dangers of lead poison were such as forbade its use. In that regard the testimony of a witness of experience—and I find no proof to the contrary—is convincing when he says: "The art had long sought for a method of using lead, making safe lead-weighted materials but was unsuccessful due to the fact apparently that the lead weighted material produced prior to the Imhoff-Berg patent was not in fixed and insoluble form and hence involved the danger of toxicity."

Referring to the Chemical Review, we find this statement as to the use of lead in the silk industry:

"It is a direct attack upon public health, and in that capacity has already brought forth evil fruits. Persons who are continuously handling such weighted silks are liable to lead-poisoning. Still greater is the risk for milliners and dressmakers who sew with silk, and who are in the habit of biting off the end of the thread, or of putting it in the mouth to make it the better enter the eye of the needle. A minute quantity of lead is taken into the system each time; it remains and accumulates, and, at last, colic, palsy, and other alarming symptoms make their appearance. These are soon traced to lead-poisoning, but not one medical man in a hundred will suspect how the lead is introduced into the patient's system. * * *

"But, to return, so long as the silk is not recognized as the source of the lead, the patient will go on using it, and recovery will therefore be impossible. This, it must be understood, is no mere matter of con-

jecture or probability, but of actual fact. Poisoning cases of the kind described have already occurred, and will certainly become more and more frequent if the evil practice is allowed to continue."

Indeed, the use of lead in silk led to legislation making it criminal. Thus, the proof is "the Imperial Health Bureau in Berlin has decided that the weighting of silk material and sewing silk with lead preparations is injurious and punishable." For these reasons, the use of lead for weighting was not successful as the literature of the art, without contradiction, shows.

In Heerman's "The Development of Silk Dyeing," published in 1906, he says: "At first the high molecular metals, as for instance lead, promised the best success, especially since the high price of tin was originally quite an objection; but all efforts to find a substitute equal to tin, and possibly cheaper, remained without success."

In 1916, Heerman, in writing Faerber-Zeitung, says: " * * * I outlined recently in detail that tin is still indispensable for modern silk weighting, and I have shown how closely the entire silk industry is connected with the tin weighting, and is even to a certain extent dependent thereon. It followed from this without further explanation why the silk industry cannot simply dispense with the weighting of the silk, but must search for ways and means to either continue securing the tin, which has become a life necessity or to stretch the available limited amounts or finally—and this would be the most radical way—to replace the tin entirely by other substances."

Continuing, he in substance says tin is the only metal weighting factor in the industry, and he therefore advises experimenters to find a substitute in these words:

"The task to create new methods with a complete elimination of the tin base is naturally more difficult. Its solution, however, would therefore, be of greater value than even the most far reaching stretching-method, since only then one would be absolutely independent of tin. The task is the more difficult because new ways and means have first to be found.

"All the experts and mills should, therefore, familiarize themselves today with this problem of the tin substitute for the purpose of silk weighting in the one or the other directions, and should contribute to aid the silk industry in complying with the requirements of to-day."

Later, 1921, he wrote: "Even with all the exertions of the industry during the war period, in which tin was scarce, it did not prove possible to replace tin by cheaper metals."

We note that even in 1924 the failure of the art to find a practical way to supersede tin still existed, as shown in Matthews' book "The Textile Fibers," which says:

"The discovery of these high figures of tin caused the trial of nearly every other metal for silk weighting. These of high atomic weight, especially lead, gave good results which seemed very promising, especially as lead is so much cheaper than tin. All these expectations, however, were doomed to disappointment and not even the great increase in cost of tin even prior to the war was able to check the development of its use for silk-weighting. * * *

"Following out this experience, manufacturers substituted baths of other metals for the successive tin baths, to a greater and greater extent, until at last only the first metal bath was of tin. This has led to many variations in the weighting process which can be traced in the patents concerned with them. Lead, bismuth, nickel, copper, manganese, and antimony have all been tried. * * *

"All these researches have been virtually useless, and manufacturers are going back more and more to loading with tin, in combination with phosphoric, silicic and tannic acids. The only practical success that has been achieved is to replace a little of the tin by alumina."

We here note that emphasis is laid on the disclosure made in the Sisley, French patent No. 258,869, of November 9, 1896. It states that in March, 1896, one Puller "took out letters patent on the introduction of aluminum salts into this cycle of operations," and adds the blanketing purpose to cover the use of some twelve metals in these words: "To sum up, by the present patent application we intend to reserve as our exclusive property the new application made in the weighting of silks, of the soluble salts of the various metals indicated above, that is to say, zinc, magnesium, iron, lead, manganese, copper, antimony, chromium, barium, calcium, strontium, and cerium, which salts, when combined with the simultaneous use of tin salts and various alkaline phosphates, silicates, and tung-

states, serve the purpose of imparting to the silk the qualities of fulness, scroop, luster, and strength, together with an increase in weight."

For anything the patent discloses, no individual method of using lead is shown and no mention made or purpose of making it insoluble is disclosed. There is no proof that this 1896 patent of Sisley had any effect on the art even in the silk industries of such a silk manufacturing country as France. Fortunately, as helping a court to determine whether Sisley did anticipate the invention of the plaintiffs made many years thereafter, samples were found of the only product Sisley made. These lead-weighted samples were made to protect the hands of operators in the use of X-rays. That the lead weighting was soluble is shown by the analysis made by the witness of plaintiffs, and his proof was not contradicted. In that regard the proof, without quoting the testimony in full and confining ourselves to the crucial and vitally important element of solubility, is: "Q. What did these tests show? A. They showed that the lead was substantially soluble in water and much more soluble in acetic acid." From what we have outlined, it will be seen that the tin treatment continued to be used for years following the date of the Sisley patent until the patentees disclosed the commercial, nonpoisonous, soluble use of lead weighting. This was disclosed in their patent No. 1,579,628, granted April 6, 1926, to Berg and Imhoff, for a "process of weighting fibres and the product thereof." Without discussing the technique of the process, it suffices to state that patentees illustrated in the five stages of treatment shown in their Figures 1 and 2 the old and the new art. In A. B. and C. of Figure 1, the old tin-weighting process is used, while the further treatment shown in D. and E. of Figure 2—and herein lies the invention by which lead is made nonpoisonous and insoluble—was the real invention disclosed by the patentee. The disclosed process found prompt, indeed phenomenal, recognition. In the seven ensuing years 1,000,000 yards of silk were Berg-Imhoff processed. The proof is that the "trade in general shifted to the lead weighting process in the year 1931 and thereafter." The lead weighting enabled silk to compete with rayon. One licensee in twenty-one months processed 29,000,000 yards of lead-weighted silk and paid $91,000 royalty. In the face of the uncontradicted proof of the great stride forward this patent made in the silk art as soon as it was disclosed, it is clear that it was both novel and useful. That it was inventive is shown by the fact that the art, which instantly recognized what Berg and Imhoff showed, would have been equally alert to recognize Sisley if he had really disclosed anything. The art ignored Sisley and welcomed Berg and Imhoff, and because this court adopts Sisley and ignores Berg and Imhoff, I respectfully, but most earnestly, dissent.